UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

DEBORAH STROUD,                                         :          00 Civ. 1760 (SHS)
                                                        :
                         Plaintiff,                     :
                                                        :          OPINION & ORDER
           -against-                                    :
                                                        :
NEW YORK CITY; NEW YORK CITY                            :
DEPARTMENT OF CORRECTION;                               :
BERNARD B. KERIK, Commissioner; LOUIS                   :
R. BURGOS, Deputy Commissioner, Equal                   :
Employment Opportunity; SHEILA M. VAUGHN,               :
Chief of Custody Management; DAVID                      :
GOODMAN, Deputy Warden in Command,                      :
Transportation Division; WALTER HAMILTON,               :
Assistant Deputy Warden; JAMES MULLANEY,                :
Captain, Rikers Island Movement Coordinator; and        :
CHRISTINE PARKER, Personnel Manager,                    :
                                                        :
                         Defendants.                    :
-----------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

**Introduction**

        This litigation arises from the somewhat contentious end of plaintiff Deborah Stroud's

19-year career with the New York City Department of Correction ("DOC").  Stroud brings this

action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and

alleges that DOC retaliated against her and constructively discharged her for bringing an earlier

suit against it for age, gender, and race discrimination.  Defendant City of New York, the sole

remaining defendant in this litigation, has moved for summary judgment in its favor.

        As more fully set forth below, that motion is granted with respect to Stroud's retaliation

claim because Stroud failed to show a causal link between the filing of her earlier suit and

DOC's adverse employment actions, and because Stroud failed to controvert DOC's legitimate,

non-retaliatory reasons for its actions.  In addition, the City's summary judgment motion is

granted with respect to Stroud's constructive discharge claim because Stroud again failed to show a causal link between the filing of her earlier suit and her purported discharge, and because the employment conditions she alleges were not objectively intolerable.

## I.      Facts

In 1981 Stroud commenced her career as a correction officer in DOC's Transportation Division.  (Def.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Def.'s Rule 56.1 Statement") ¶18; Dep. of Deborah Stroud dated Feb. 9, 2004 at 25:5-6, Ex. C to Def.'s Rule 56.1 Statement).  The first event relevant to this litigation did not occur until 1994 – 13 years later – when Stroud, while working on Rikers Island, slipped and fell on some "black ice" and suffered a knee injury.  (Letter of Deborah Stroud to Louis R. Burgos dated Aug. 11, 1999, Pl'.s Affirm. in Opp'n to Mot. for Summ. J.).  Stroud's fall precipitated a gradual slide into what DOC characterizes as a history of chronic absenteeism.

In 1994 Christine Parker, DOC's personnel supervisor, "formally counseled and warned" Stroud that she had been "out sick" on several occasions and that "if this pattern of sick leave use continued, [Stroud] would be placed in Category A or B pursuant to DOC Directive 2258R." (Def.'s Rule 56.1 Statement ¶ 57; Memo from Christine Parker to Deborah Stroud dated Feb. 18, 1994, Ex. P to Def.'s Rule 56.1 Statement).

DOC Directive 2258R (the "Directive") sets forth DOC's policy on its employees' use of sick leave and the problem of "chronic absence."  (Directive 2258R, Ex. I to Def.'s Rule 56.1 Statement).  The Directive provides that a person who reports sick on five or more occasions during a twelve-month period "shall be classified in Category A and notified … in writing of the classification."  (Id. at 1).  A person who reports sick either on six or more occasions or on twelve or more days during a twelve-month period "shall be classified in Category B."  (Id. at 2).

An employee designated as Category A or B "may lose certain discretionary benefits and privileges, which include, (a) assignment to a steady tour; (b) assignment to a specified post; [and] (c) access to voluntary overtime." (Def.'s Rule 56.1 Statement ¶ 38). A DOC employee has a "specified" or "steady" post when she receives the same assignment every day. (Id. ¶ 39; Stroud Dep. at 85:3-16, Ex. C to Def.'s Rule 56.1 Statement). Similarly, an employee has a "steady tour" when she works either days or nights exclusively. (Def.'s Rule 56.1 Statement ¶ 39; Stroud Dep. at 85:3-16, Ex. C to Def.'s Rule 56.1 Statement). Once an employee is designated as Category A or B, the designation remains in effect for six months; if the employee is not absent during that six-month period, then DOC removes the designation. (Def.'s Rule 56.1 Statement ¶ 36).

Despite the warning from DOC, Stroud's absences continued. One year later, DOC again warned her that because she had been absent on three additional occasions for seven days she risked being designated either Category A or B unless her absences ceased. (Id. ¶ 58; Memo from Christine Parker to Deborah Stroud dated Apr. 6, 1995, Ex. P to Def.'s Rule 56.1 Statement). Six months later, however, DOC again warned Stroud that she had been absent yet an additional three times for eight more days, and that she risked a Category A or B designation. (Def.'s Rule 56.1 Statement ¶ 59; Memo from Christine Parker to Deborah Stroud dated Sept. 18, 1995, Ex. P to Def.'s Rule 56.1 Statement). Four months later DOC informed Stroud that she had been absent three more times for four days, and warned her for a fourth time that if the pattern continued, DOC would designate her either Category A or B. (Def.'s Rule 56.1 Statement ¶ 60; Memo from Christine Parker to Deborah Stroud dated Jan. 18, 1996, Ex. P to Def.'s Rule 56.1 Statement).

In August of 1997 – one and a half years after Stroud's fourth warning concerning her use of sick leave – she filed <u>Stroud v. New York City Department of Correction, et al.</u>, 97 Civ. 6750 ("<u>Stroud I</u>"), in which she alleged that DOC discriminated against her because of her age, gender, and race.  In the instant action, Stroud contends that DOC retaliated against her and constructively discharged for filing the 1997 suit.

Stroud's absences continued and eight months later DOC designated her "chronic absent – Category B."  (Def.'s Rule 56.1 Statement ¶ 54; Designation of Chronic Absent – Category B dated Apr. 24, 1998, Ex. O to Def.'s Rule 56.1 Statement).  DOC informed her in writing that due to her designation, she ran the risk of losing her steady tour, steady post, and the opportunity to work voluntary overtime.  (Memo from Clyton Eastmond to Deborah Stroud dated Apr. 23, 1998, Ex. O to Def.'s Rule 56.1 Statement).

Stroud appealed her designation to DOC's Health Management Division, asserting that her absences stemmed from a second work-related injury that she sustained during a car accident in 1997.  (Def.'s Rule 56.1 Statement ¶ 55; Category B Appeal dated May 1, 1998 & Memo from Mortessa Gibbs to Clyton Eastmond dated June 17, 1998 Ex. O to Def.'s Rule 56.1 Statement).  Because a work-related injury caused her to be absent, Stroud claimed, those absences did not accumulate toward a Category A or B designation.  (Def.'s Rule 56.1 Statement ¶ 55).  However, in June of 1998 DOC rejected this view and denied her appeal.  (Memo from Clyton Eastmond to Absence Control Coordinator dated May 14, 1998, Ex. O to Def.'s Rule 56.1 Statement).

Six months later – and 16 months after she filed <u>Stroud I</u> – Stroud had surgery on the knee she injured on Rikers Island in 1994.  (Def.'s Rule 56.1 Statement ¶ 19).  Although she was hospitalized for only three days in March of 1999, she was absent from work for five months

from mid-December of 1998 until mid-May of 1999. (Id. ¶¶ 19-20; Letter from Irma Jacqueline Ozer, Esq. to Deborah Stroud dated Oct. 12, 1999, Ex. N to Def.'s Rule 56.1 Statement). Stroud eventually returned to work on May 15, 1999, almost two years after she filed Stroud I.

While Stroud was absent from work, DOC circulated to all Transportation Division personnel a memo dated April 13, 1999 that set forth the division's policy with respect to medically monitored correction officers. (Memo from David Goodman to Transp. Div. Pers. dated Apr. 13, 1999, Ex. H to Def.'s Rule 56.1 Statement). The memo provided that, "Effective April 25, 1999, all medically monitored correction officers will be assigned to a 4 x 2 squad for the duration of their medically monitored status. 5 x 2 assignments at transportation will only be filled by full duty officers in order to maximize personnel staffing of the primary mission of court delivery and support." (Id.).

The terms "4 x 2" and "5 x 2" refer to the number of consecutive days a correction officer works and the number of consecutive days the officer has off. (Def.'s Rule 56.1 Statement ¶ 25; Stroud Dep. at 59:15-25, Ex. C to Def.'s Rule 56.1 Statement). For example, a 5 x 2 assignment requires a correction officer to work for five consecutive days, followed by two consecutive days off. If a correction officer is given a 5 x 2 assignment, the days of the week that she has off remain fixed. However, when an officer is given a 4 x 2 assignment, the days that she has off will vary each week; this rotating schedule of days off is known as "the wheel." (Def.'s Rule 56.1 Statement ¶ 26; Stroud Dep. at 41:25-42:9, Ex. C to Def.'s Rule 56.1 Statement).

Upon Stroud's return to work, a DOC physician examined her, determined that she had "serious physical/psychological limitations," and placed her on "Medically Monitored Returned Duty Status." (Def.'s Rule 56.1 Statement ¶¶ 20-21; Medically Monitored Return Restriction Form dated May 7, 1999, Ex. G to Def.'s Rule 56.1 Statement). In the "medically monitored

return restriction form," the doctor noted that Stroud could not work overtime and did not require a steady tour. (Medically Monitored Return Restriction Form dated May 7, 1999, Ex. G to Def.'s Rule 56.1 Statement). Because of her medically monitored designation, Stroud was placed on the wheel pursuant to the April 13 memo, but within "a couple of weeks" she returned to full time, 5 x 2 assignments. (Def.'s Rule 56.1 Statement ¶¶ 27-28; Stroud Dep. at 114:5-19, Ex. C to Def.'s Rule 56.1 Statement).

In addition, upon Stroud's return to work, for the second time DOC designated her a Category B chronically absent employee. (Def.'s Rule 56.1 Statement ¶¶ 40-44). DOC informed Stroud in writing that she was subject to the denial or revocation of her "steady assignment and/or tour of duty" and the opportunity to "perform[] voluntary overtime." (Def.'s Rule 56.1 Statement ¶¶ 40-44; Memo from David Goodman to Deborah Stroud dated May 19, 1999, Ex. K to Def.'s Rule 56.1 Statement). Indeed, Stroud stated that she knew that DOC could withdraw any one of those benefits from her because of her Category B designation. (Stroud Dep. at 137:12-138:4, Ex. C to Def.'s Rule 56.1 Statement).

Stroud appealed her designation within DOC, again arguing that because her absences resulted from a line-of-duty injury, they did not count toward a Category A or B designation; however, DOC's deputy warden in command denied Stroud's appeal. (Def.'s Rule 56.1 Statement ¶¶ 45-49; Memo from David Goodman to Absence Control Coordinator dated June 14, 1999, Ex. L to Def.'s Rule 56.1 Statement). In July, DOC placed Stroud back on a 4 x 2 assignment. (Def.'s Rule 56.1 Statement ¶¶ 52-53).

In August, Stroud retired from DOC after 19 years in its employ. (Def.'s Rule 56.1 Statement ¶ 53). She left because she was "fed up" with "all the different things that happened to [her]…." (Id. ¶ 63). She "felt that [she] should not go on the wheel, lose the overtime, [and

have her steady] post taken away…." (Id.).  Due to 37 days of "terminal leave," Stroud

remained on the payroll until December 13; her retirement became effective the next day.

(Letter from Alan Vengersky to Deborah Stroud dated Nov. 10, 1999, Ex. Q to Def.'s Rule 56.1

Statement).  Since retiring, Stroud has collected a monthly pension.  (Def.'s Rule 56.1 Statement

¶ 66; Retirement Resolution dated Oct. 19, 2000, Ex. S to Def.'s Rule 56.1 Statement).

## II.    The Complaint and Procedural History

By the time Stroud commenced this action in January of 2000, the City had filed a

summary judgment motion in Stroud I seeking judgment in its favor.  Because the complaints in

both actions set forth very similar allegations and legal theories, Magistrate Judge Eaton, who

was handling the general pre-trial management of both Stroud actions, stayed all proceedings in

this action until determination of the summary judgment motion in Stroud I.  (See Mem. and

Order of Judge Douglas F. Eaton dated Apr. 7, 2000).

Judge Eaton then issued a Report and Recommendation in which he concluded that this

Court should grant defendant's summary judgment motion in Stroud I and order Stroud to show

cause why the complaint in this action should not be dismissed as well.  (See Report and

Recommendation of Judge Douglas F. Eaton dated Sept. 20, 2000).  This Court ultimately

adopted Judge Eaton's Report and Recommendation, granting summary judgment for defendants

in Stroud I and ordering Stroud to show cause why the Court should not dismiss this action as

well.  (See Order dated Nov. 28, 2000).  After receiving her response, this Court concluded that

she had shown cause for why her retaliation claim against the City of New York should proceed.

(See Order dated Oct. 1, 2003).  However, the Court dismissed her claims against the individual

defendants and the Department of Correction on the grounds that Title VII claims may not

proceed against individuals and that the Department of Corrections was not a separate juridical entity. (Id.).

The surviving claims – two claims for relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against the City of New York – were for retaliation and constructive discharge. Stroud asserts that DOC retaliated against her in several different ways for filing Stroud I. Specifically, Stroud claims that DOC withdrew her "steady post," "steady tour," and "steady pass days"; that DOC placed her on a "rotating scheduling without proper notification"; and that DOC "denied [her] the opportunity to work overtime," which resulted in a reduction in her pension. In addition, Stroud claims that she "was forced into early retirement to preserve the pension benefits that [she] had already earned."

Judge Eaton ordered that any dispositive motions were to be served and filed by April 23, 2004. (See Scheduling Order of Judge Douglas F. Eaton dated Dec. 22, 2003). That deadline was first extended to July 1 and then to August 16. (See Memo-endorsed Letter of Rippi Gill to Judge Douglas F. Eaton dated May 25, 2004). However, by mid-July – after the close of discovery – Stroud had not yet responded to all of defendant's discovery requests and instead asked for another extension of 60 days in which to respond. Judge Eaton granted the request and extended the deadline for plaintiff to provide discovery to September 15 and the deadline for dispositive motions to October 15. (See Mem. and Order of Judge Douglas F. Eaton dated July 26, 2003).

Despite the numerous extensions granted to Stroud, by September 15 she still had not provided the requested discovery to defendant. Judge Eaton issued an order in which he yet again extended the deadline for Stroud to provide discovery to September 29, and the deadline for dispositive motions to November 15. (See Mem. and Order of Judge Douglas F. Eaton dated

Sept. 28, 2004).  Judge Eaton notified Stroud that "her failure to comply with any order of our Court may result in the dismissal of her complaint with prejudice" pursuant to Fed. R. Civ. P. 41(b).  (Id. at 2).  He also set forth that she was subject to a $50 fine for each day that she failed to comply with the discovery deadline.  (Id. at 2).  The following day, Stroud asked that an attorney be appointed to represent her and that the action be stayed until an attorney was appointed.  (See Order of Douglas F. Eaton dated Oct. 4, 2004 at 1).  Judge Eaton denied both requests, and again ordered Stroud to comply with his earlier orders.  (Id.).

Nonetheless, by the end of October, Stroud still had not provided the requested discovery. Judge Eaton once again ordered Stroud to provide the City of New York with the discovery it had requested, again warned her that he would recommend dismissal of her complaint if she failed to comply, and again provided that she would be subject to a fine of $50 for each day that she failed to comply.  (See Order of Judge Douglas F. Eaton dated Oct. 26, 2004).  Last, Judge Eaton yet again extended the deadline for dispositive motions to December 15.  (Id. at 2).  On that date, the City of New York served this summary judgment motion upon Stroud.  (See Letter of Rippi Gill, Esq. to Judge Douglas F. Eaton dated Dec. 22, 2004).

Pursuant to Local Rule 56.2, the City's moving papers included a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" that explained that Stroud's claims "may be dismissed without a trial" if she did not respond to defendant's motion.  (See Notice to Pro Se Litigant Opposing Motion for Summary Judgment ¶ 1).  It further provided that she "must submit evidence, such as witness statements, or documents, countering the facts asserted by Defendant and raising issues of fact for trial," (id. ¶ 2), and that if Stroud did "not respond to Defendant's motion for summary judgment in a timely fashion with affidavits or documentary

evidence contradicting the facts asserted by the defendants, the Court may accept Defendant's factual assertions as true." (Id. ¶ 3).

Upon request, this Court extended Stroud's deadline to submit her response to the City's motion and notified Stroud that, "If no responsive papers are filed by March 18, the motion will be decided on the basis of the motion papers." (See Memo-endorsed Letter of Deborah Stroud to the Court dated Feb. 18, 2005). The Court later extended that deadline to April 15 and again notified Stroud that the "claims in the complaint may be dismissed without a trial if plaintiff does not respond with sworn affidavits or other papers as set forth in Fed. R. Civ. P. 56(e) and the 'Notice to Pro Se Litigant Opposing Motion for Summary Judgment….'" (See Order dated Mar. 24, 2005).

On March 25, the Court received Stroud's "Affirmation in Opposition to Motion for Summary Judgment" with exhibits, as well as Stroud's "Supplemental Affirmation in Opposition to Motion for Summary Judgment," also with exhibits. In addition, on April 15, 2005, the Court received a letter from Stroud along with more exhibits. However, none of Stroud's submissions contained a memorandum of law or a counter statement of material facts pursuant to Local Civil Rule 56.1.

### III.   Analysis

A.  The Summary Judgment Standard

Summary judgment is appropriate only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995); LaFond v. Gen. Physics Serv., Corp., 50 F.3d 165, 171 (2d Cir. 1995). In determining whether a genuine issue of material fact exists,

the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); see LaFond, 50 F.3d at 171.

However, the nonmoving party "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" in support of its factual assertions. Patterson, 375 F.3d at 219 (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)). Specifically, to defeat the City's summary judgment motion, Stroud must show that "there is sufficient evidence favoring [her] for a jury to return a verdict for [her]." Golden Pacific Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (internal quotation marks omitted).

In addition, when a non-moving party fails to respond to a summary judgment motion by submitting a counter statement of material facts pursuant to Local Civil Rule 56.1, the Court deems admitted the moving party's statement of material facts. See Local Civil Rule 56.1(c); LaSane v. Hall's Security Analyst, Inc., 239 F.3d 206, 210-11 (2d Cir. 2001); Gitlow v. United States, 319 F.Supp.2d 478, 480 (S.D.N.Y. 2004); Gadsen v. Jones Lang Lasalle Americas, Inc., 210 F.Supp.2d 430, 438 (S.D.N.Y. 2002) (collecting cases). In this instance, because Stroud has failed to proffer a counter statement of material facts despite two explicit notices setting forth the necessity and method of responding to this motion and numerous extensions of time in which to respond properly, the Court takes as true all the assertions set forth in the City's Local Civil Rule 56.1 Statement of Undisputed Facts.

B. The Standards that Govern Title VII Retaliation Claims

Title VII prohibits an employer from discriminating against an employee because she has "opposed any practice made an unlawful employment practice by this subchapter…." 42 U.S.C. § 2000e-3(a). The Court evaluates Title VII retaliation claims pursuant to the tripartite burden shifting framework established in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "In the context of a motion for summary judgment, the plaintiff must first demonstrate a prima facie case of retaliation…." Richardson v. Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999); see also Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). In order to establish her prima facie case, the plaintiff must demonstrate "(1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse employment decision." Richardson, 180 F.3d at 443; see also Cifra, 252 F.3d at 216; Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998).

A plaintiff may establish the requisite causal connection either directly or indirectly. A plaintiff may establish causation indirectly by showing "that the protected activity was followed closely by discriminatory treatment." DeCintio v. Westchester County Med.Ctr., 821 F.2d 111, 115 (2d Cir. 1987); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam); Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991).

In addition, the plaintiff may show causation indirectly "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." DeCintio, 821 F.2d at 115; see also Johnson, 931 F.2d at 207. The plaintiff also may satisfy the causation requirement directly through "evidence of a retaliatory animus directed against plaintiff by defendant." DeCintio, 821 F.2d at 115; see also Johnson, 931 F.2d at 207.

Once the plaintiff has established a prima facie case of retaliation, the defendant "has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained of action." Richardson, 180 F.3d at 443; see also Cifra, 252 F.3d at 216; Quinn, 159 F.3d at 768. Last, if the defendant meets its burden, then the plaintiff "must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Cifra, 252 F.3d at 216; see also Richardson, 180 F.3d at 443; Quinn, 159 F.3d at 768.

C.  The Standards that Govern Constructive Discharge Claims

Constructive discharge occurs when the "employer, rather than discharging [his employee] directly, intentionally creates a work environment so intolerable that [the employee] is forced to quit involuntarily." Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004) (quoting Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003)) (internal quotation marks omitted); see also Whidbee v. Garzarelli Food Spec., Inc., 223 F.3d 62, 73-74 (2d Cir. 2000). The immediate focus of a constructive discharge claim is both the employer's subjective intent and the employee's objective working conditions. Petrosino, 385 F.3d at 229.

While the plaintiff need not demonstrate that her employer acted with the specific intent to force her to resign, the plaintiff "must at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective." Petrosino, 385 F.3d at 229-30 (internal quotation marks and brackets omitted); see also Whidbee, 223 F.3d at 74; Kader v. Paper Software, Inc., 111 F.3d 337, 339-40 (2d Cir. 1997).

The Court applies an objective standard in determining whether an employee's working conditions are "intolerable": "Working conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt

compelled to resign." Petrosino, 385 F.3d at 230 (quoting Terry, 336 F.3d at 152) (internal quotation marks omitted); see also Kader, 111 F.3d 340-41; Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156-57 (2d Cir. 1993); Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360-61 (2d Cir. 1993); Pena v. Brattleboro Retreat, 702 F.2d 322, 325-26 (2d Cir. 1983).  A constructive discharge claim will fail when the evidence demonstrates that the employee merely was "dissatisfied with the nature of his assignments," Stetson, 995 F.2d at 360; Pena, 702 F.2d at 325, or that the working conditions were merely "difficult or unpleasant," Stetson, 995 F.2d at 360.

In addition, in order to state a prima facie case of constructive discharge, the plaintiff must "establish that the constructive discharge occurred in circumstances giving rise to an inference" of retaliation.  See Terry, 336 F.3d at 152 (internal quotation marks omitted).  As with the law applicable to broader retaliation claims outlined above, the plaintiff may establish causation either directly or indirectly, the latter method achieved through proof of disparate treatment or a close proximity between the protected activity and the purported discharge.  Id.

D.  The City Is Entitled to Summary Judgment with Respect to Stroud's Retaliation Claim

Defendant asserts two reasons why Stroud's retaliation claim fails as a matter of law. First, it contends that Stroud failed to make out a prima facie case of retaliation because she proffered no evidence upon which a reasonable juror could find that there was a causal connection between the protected activity and the adverse employment actions.  Second, it urges that even if Stroud made out a prima facie case of retaliation, the City has put forth evidence illustrating legitimate, non-retaliatory reasons for DOC's actions while Stroud offered no evidence from which a reasonable juror could infer that those reasons were pretextual.  The Court agrees and turns to each of those contentions.

1.  Stroud Failed to Make Out a Prima Facie Case

Stroud asserts that in retaliation for filing <u>Stroud I</u> in 1997, in 1999 DOC withdrew her steady post and steady tour, suspended her ability to work voluntary overtime, and placed her on the wheel, and that these actions in turn resulted in her loss of "comp time" and pension benefits. However, Stroud offers no evidence of the causal link that is an indispensable component of her prima facie case; namely, the link between her filing of <u>Stroud I</u> and her employer's alleged retaliatory actions.

Stroud has offered no direct evidence whatsoever of defendant's alleged retaliatory animus, and an independent examination of the record reveals no such evidence. In addition, Stroud has not come forward with any evidence indirectly illustrating the necessary causation. Stroud asserts that defendant treated differently other employees who were situated similarly to her: "As far as I know, <u>no one</u> else has gotten Category B papers for a surgery and rehabilitation approved by workers' compensation." (Letter from Deborah Stroud to the Court dated Feb. 20, 2001 at 2, Pl.'s Affirm. in Opp'n to Summ. J. (emphasis in original)). However, Stroud's ipse dixit is insufficient to defeat a motion for summary judgment, and the record contains no evidence that supports her assertion of disparate treatment. Mere conclusory statements are not substitutes for proof.

Finally, the yawning temporal gap between the filing of <u>Stroud I</u> and the alleged retaliatory conduct cannot give rise to an inference of causation. Stroud alleges that the retaliation began when she returned to work in May of 1999 after her surgery the previous December. However, the protected activity – the filing of <u>Stroud I</u> – occurred in August of 1997 – almost two years before the retaliation allegedly commenced. <u>See, e.g.</u>, <u>Richardson</u>, 180 F.3d at 447 ("This two year gap is too wide to support the inference that she was terminated in retaliation for complaining about discrimination…."); <u>Hollander v. Amer. Cyanamid Co.</u>, 895

F.2d 80, 85-86 (2d Cir. 1990) (time span of "several months" not sufficient, by itself, to raise inference of causation); Carr v. WestLB Admin., Inc., 171 F.Supp.2d 302, 309-10 (S.D.N.Y. 2001) (four-month time span precluded inference of causation); Castro v. Local 1199, Nat'l Health & Human Servs. Employees Union, 964 F.Supp. 719, 729 (S.D.N.Y. 1997) (time span of "over a year" not sufficient to raise an inference of causation); Zenni v. Hard Rock Café Intern., Inc., 903 F.Supp. 644, 656 (S.D.N.Y. 1995) (time span of "more than a year" not sufficient to raise an inference of causation).

The fact that Stroud was absent from work for approximately five of the 21 months between the filing of Stroud I and defendant's alleged retaliation does not alter the calculus; irrespective of that five-month period, Stroud worked for 16 months after filing Stroud I and claims no retaliation during that period. Regardless of what may be the "outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," Lovejoy-Wilson v. Noco Motor Fuel, Inc., 262 F.3d 208, 224 (2001), 16 months is too remote as a matter of law to support, by itself, an inference of causation. Hollander, 895 F.2d at 85-86; Carr, 171 F.Supp.2d at 309-10; Castro, 964 F.Supp. at 729; Zenni, 903 F.Supp. at 656.

In addition, Stroud's absenteeism and DOC's adverse responses to it began well before Stroud returned to work in May of 1999 after her five-month absence; in fact, as early as 1994 DOC warned Stroud of the possible adverse consequences of her continued absences, including Category B designation. Before Stroud ever filed Stroud I – i.e., before she ever engaged in the protected activity – she had been warned four times that continued absences would result in the deprivation of her steady post, steady tour, and the opportunity to work voluntary overtime. Because the "adverse employment actions were both part, and the ultimate product, of 'an extensive period of progressive discipline,'" beginning prior to the protected activity, Stroud

cannot make out a prima facie case with respect to causation. <u>Slattery v. Swiss Reins. Amer.</u> <u>Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Accordingly, the Court concludes that Stroud failed to adduce evidence upon which a reasonable juror could determine that the filing of <u>Stroud I</u> caused DOC to take adverse job actions against her.

> 2. Defendant Offered a Legitimate, Non-retaliatory Basis for Its Actions, and Stroud Offered No Evidence of Pretext

Even assuming that Stroud satisfied the requirements of her initial burden, DOC amply demonstrated legitimate reasons for taking adverse employment actions against her. Specifically, defendant produced evidence that it based its actions vis-à-vis Stroud upon generally applicable policies setting forth both penalties for chronic absenteeism and job restrictions for employees who have physical limitations. Confronted with this evidence, Stroud failed to come forth with any evidence even arguably demonstrating that these proffered explanations were merely pretextual. Again, an independent examination revealed that there is no evidence in this record that DOC's explanations for its employment actions were pretexts for discrimination.

Specifically, defendant pointed to (1) the Directive, which set forth the categories of chronically absent employees and the applicable penalties, including the loss of a steady post, a steady tour, and access to voluntary overtime; (2) its numerous warnings to Stroud prior to the filing of <u>Stroud I</u>, which alerted her that she risked a Category B designation; and (3) its first designation of Stroud as a Category B chronically absent employee, which was not part of the retaliation that Stroud alleges.

In addition, defendant pointed to the April 13, 1999 memo, which contains its policy that all medically monitored personnel would be placed on the wheel. Defendant further adduced the physician's designation of Stroud as having "serious physical/psychological limitations" that required her to be placed upon medically monitored returned duty status, and hence, to be placed upon the wheel. All of this evidence, taken together, establishes a legitimate, non-retaliatory basis for defendant's actions and thus satisfies its burden pursuant to the second step of the McDonnell Douglas framework.

In response to the evidence illustrating the legitimate basis for DOC's actions, Stroud offered no evidence that DOC's proffered reasons were pretextual. Because Stroud offered no such evidence, and because the record contains no such evidence, the Court concludes that no reasonable juror could determine that the explanation defendant advances was pretextual.

In sum, the Court grants the City's motion for summary judgment with respect to Stroud's Title VII retaliation claim because (1) Stroud failed to make out a prima facie case of retaliation since she cannot demonstrate a causal link between the filing of Stroud I and defendant's adverse employment actions, and (2) defendant offered a legitimate basis for its actions, while Stroud offered no evidence that this basis was pretextual.

E.  The City Is Entitled to Summary Judgment with Respect to Stroud's Constructive Discharge Claim

The City urges two reasons why the Court should grant it summary judgment on Stroud's constructive discharge claim. First, it asserts that Stroud offered no evidence supporting the existence of a causal link between the filing of Stroud I and the creation of allegedly intolerable employment conditions. Second, it claims that the evidence establishes as a matter of law that Stroud's working conditions were not so intolerable that a reasonable person in Stroud's position

would have been compelled to resign.  Here too, the Court agrees with the City and now turns to each of those contentions.

### 1.   Stroud Failed to Establish an Inference of Causation

For the reasons set forth above concerning Stroud's failure to establish an inference that her filing of Stroud I caused DOC to retaliate against her, Stroud has similarly failed to demonstrate "the requisite causal connection between the purported discharge and her filing of … the federal lawsuit."  Richardson, 180 F.3d at 447; see also Terry, 366 F.3d at 152.  Here, Stroud filed Stroud I in August of 1997, and she claims she was constructively discharged two years later, in August of 1999.  Thus, here, just as in Richardson, "[t]his  two year gap is too wide to support the inference that she was terminated in retaliation for complaining about discrimination…."  Richardson, 180 F.3d at 447.  Accordingly, Stroud's constructive discharge claim fails as a matter of law.

### 2.   Stroud's Employment Conditions Were Not Intolerable

The record also establishes that Stroud's working conditions were not the type of intolerable environment required to support a constructive discharge claim.  Due to her Category B designation, Stroud lost the benefits of working the same assignment every day, working the same hours every day, and working voluntary overtime hours.  Due to her medically monitored returned duty status, Stroud lost the benefit of a 5 x 2 schedule and instead worked a 4 x 2 schedule.

Stroud also claims that the modified employment conditions cost her "comp time" and threatened to reduce her pension benefits.  As to her claim of lost comp time, Stroud offers no explanation of what comp time is, or how she allegedly lost any of it.  As to her claim of reduced pension benefits, Stroud asserts that her pension was scaled to the last three years of her salary.

Her inability to work voluntary overtime caused her salary to diminish and her diminished salary, in turn, would result in a diminished pension. In order to prevent this erosion of her pension, Stroud claims, she was forced to resign.

However, Stroud has not presented any evidence establishing that the last three years of her salary would indeed determine the level of her pension benefits. Even assuming that this assertion is true, Stroud has not presented any evidence demonstrating the extent to which her pension benefits would have been reduced had she continued working.

Moreover, when analyzed together, the employment restrictions she asserts are not so objectively unreasonable that Stroud had no other choice but to resign. Stroud may have been "dissatisfied with the nature of [her] assignments," Stetson, 995 F.2d at 360; Pena, 702 F.2d at 325, and her working conditions may have been somewhat "difficult or unpleasant," Stetson, 995 F.2d at 360, but these circumstances are by no means "so intolerable that [Stroud was] forced to quit involuntarily," Petrosino, 385 F.3d at 229 (quoting Terry, 336 F.3d at 151-52) (internal quotation marks omitted).

In addition, the conditions of which Stroud complains were fleeting. Stroud's Category B designation could last only for six months if she was not absent from work within that time period; Stroud was placed on the wheel for mere weeks. Apart from the manner in which the brevity of the conditions mitigated their impact, their transient nature also provided Stroud with an option separate from resigning: she could have waited a short time for the conditions to abate. Stroud thus "has not demonstrated that quitting was the only way out of her … dilemma." Petrosino, 385 F.3d at 231; see also Spence, 995 F.2d at 1157 ("The record reveals that Spence had a quite effective alternative to resignation.").

Therefore, the Court grants the City summary judgment on Stroud's claim of constructive discharge because (1) Stroud failed to produce evidence upon which a reasonable juror could find that the filing of Stroud I caused the City to constructively discharge her two years later; and (2) Stroud failed to produce evidence upon which a reasonable juror could conclude that her working conditions were so intolerable that she was forced to resign.

**Conclusion**

As more fully set forth above, the City's summary judgment motion is granted with respect to Stroud's retaliation claim because (1) Stroud failed to show a causal link between the filing of her earlier suit and DOC's adverse employment actions and (2) Stroud failed to controvert DOC's legitimate, non-retaliatory reasons for its actions. In addition, the City's summary judgment motion is granted with respect to Stroud's constructive discharge claim because (1) Stroud again failed to show a causal link between the filing of her earlier suit and her purported discharge and (2) the employment conditions she alleges were not objectively intolerable. Accordingly, the Clerk of Court shall enter judgment dismissing the complaint.

Dated:  New York, New York
         June 22, 2005

SO ORDERED:

Sidney H. Stein, U.S.D.J.